UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

SHEILA WOLK,

                          Plaintiff,                    10 Civ. 4135

                                                        OPINION

        -against-


KODAK IMAGING NETWORK, INC., EASTMAN
KODAK COMPANY, and PHOTOBUCKET.COM,
INC.,

                          Defendants.

----------------------------------------X

A P P E A R A N C E S :


        Pro Se

        Sheila Wolk
        7 West 87th Street, Apt. 2D
        New York, NY  10024


        Attorneys for Defendants Kodak Imaging Network, Inc.
        and Eastman Kodak Company

        NIXON PEABODY LLP
        100 Summer Street
        Boston, MA  02110
        By:  Gina M. McCreadie, Esq.

        437 Madison Avenue
        New York, NY  10022
        By:  Mark D. Robins, Esq.

        One Embarcadero Center
        San Francisco, CA  94111
        By:  Talley M. Henry, Esq.

<u>Attorneys for Defendant Photobucket.com, Inc.</u>

NORWICK SCHAD & GOERING
110 East 59th Street, 29th Floor
New York, NY  10022
By:  Kenneth P. Norwick, Esq.

SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue
New York, NY  10169
By.  Mark Alan Lerner, Esq.

**Sweet, D.J.**

There are seven motions pending before the Court.
Plaintiff pro se Sheila Wolk (the "Plaintiff" or "Wolk") has
filed motions, pursuant to Fed. R. Civ. P. 56, for both partial
summary judgment against Defendants Kodak Imaging Network, Inc.
and Eastman Kodak Company (collectively, the "Kodak Defendants")
as well as summary judgment against Photobucket.com, Inc.
("Photobucket" and, with the Kodak Defendants, the
"Defendants").  The Kodak Defendants have filed a cross motion
for summary judgment with respect to all counts of Plaintiff's
complaint pursuant to the same rule.  Photobucket has filed its
own similar motion.  In addition to the four summary judgment
motions, also pending before the Court are Plaintiff's motion to
amend, Plaintiff's motion to admit expert testimony and a motion
Plaintiff has filed entitled "Motion To Investigate The
Subordination And Acts Of Perjury By The Defendants."

Upon the findings and conclusions set forth below,
Plaintiff's motion for partial summary judgment against the
Kodak Defendants, motion for summary judgment against
Photobucket, motion to amend, motion to admit expert testimony

1

and motion to investigate are denied.  Defendants' motions for summary judgment are granted.

## Prior Proceedings

Wolk filed her initial complaint on May 19, 2010 and an amended complaint on July 6, 2010 (the "Complaint").  In the Complaint, Wolk seeks declaratory judgment and an injunction and alleges both direct and secondary copyright infringement and interference with advantageous business relationships.  Wolk, an independent artist of fantasy images and sports art, licenses her images through an exclusive licensing agent.  Wolk alleges that clients of Photobucket have displayed, copied, modified and otherwise used her images on its site in violation of her copyrights, and that the Defendants have displayed, copied, prepared derivative works and distributed her images without a valid license.

The Complaint alleges seven counts, including a request for a declaratory judgment, a request for an injunction, contributory copyright infringement by Photobucket, vicarious copyright infringement by Photobucket, direct infringement by Photobucket, direct liability for infringement by the Kodak

2

Defendants and interference with advantageous business relations by the Kodak Defendants.

There have been several matters upon which the Court has already passed judgment.  On September 15, 2010, Wolk filed an Emergency Motion for a Preliminary Injunction.  After granting requests for extensions of time, the motion was considered fully submitted on November 3, 2010, and, in an opinion dated March 17, 2011, Wolk's motion was denied on grounds that the Plaintiff did not demonstrate a likelihood of success on the merits and the Plaintiff failed to satisfy the other criteria necessary to obtain relief.  On March 22, 2011, Wolk filed a motion to compel the release of confidential documents to her proposed expert witness.  Plaintiff's motion was denied on grounds that the Plaintiff had not established her expert to be a "bona fide professional expert" as required under the parties' Stipulated Confidentiality Order, but the Plaintiff was granted leave to move to qualify her proposed expert as an appropriate witness under Daubert.  Also on March 22, 2011, Plaintiff filed a motion to increase the time allotted for discovery and expert reports.  The motion was granted and deadlines to complete discovery and serve expert reports were extended.  On April 11, 2011, Wolk filed a motion to strike

3

deposition testimony of Plaintiff's licensing agent and
information relating to Plaintiff's expert.  Finding no basis
under the Rules of Civil Procedure for this request, the Court
denied the Plaintiff's motion.

There are seven motions that remain pending before the
Court.  On April 8, 2011, Plaintiff filed a "Motion To
Investigate The Subordination And Acts Of Perjury By The
Defendants," and, on April 19, 2011, both the Kodak Defendants
and Photobucket filed separate affirmations in opposition to the
Plaintiff's motion.  On May 4, 2011, Wolk filed a motion for
partial summary judgment against the Kodak Defendants.  In
response, the Kodak Defendants filed both their opposition to
the Plaintiff's motion for partial summary judgment as well as a
cross-motion for summary judgment on all counts.  The motions
were marked fully submitted on July 27, 2011.  Plaintiff filed a
motion to amend her complaint on June 26, 2011, which the Kodak
Defendants have opposed.  On September 13, 2011, Wolk filed a
motion to admit the expert testimony of Dr. Robert Sarvis.  The
motion was marked fully submitted on October 28, 2011.  On
September 23, Photobucket filed a motion for summary judgment
with respect to all counts of the Complaint.  On October 15,
2011, the Plaintiff filed a cross-motion for summary judgment

4

against Photobucket on all counts.  These motions were marked
fully submitted on November 30, 2011.

**The Facts**

The facts are set forth in the Local Rule 56.1
Statements of Undisputed Fact submitted by Wolk, the Kodak
Defendants and Photobucket.  The facts are not in dispute except
as noted below.

Wolk has been a professional artist for over 40 years.
Working alone, Wolk spends a great deal of time creating and
producing her art.  Some of the images Wolk creates can consume
as much as a year of Wolk's professional time to create and
produce in final form.  The Plaintiff's sole source of income is
the sale or licensing of her art, and Wolk runs an online store
that exclusively sells her art.  The art the Plaintiff creates
is owed by Wolk and is registered with the United States
Copyright Office.

Photobucket is a photo-sharing Internet service
provider that operates a website located at
http://www.photobucket.com.  Photobucket is what is known as a

5

"user-generated content" website, which provides an online
platform for users to post material that the users themselves
upload.  Photobucket enables users who establish a Photobucket
account to upload digital photographs and videos so that they
may be stored and viewed on the website.  The images and videos
posted to Photobucket, of which there are approximately 9
billion, are generated by the users themselves.  Each image or
video on Photobucket is associated with a unique uniform
resource locator, or "URL."  Photobucket does not charge a fee
to users to use its website, and Photobucket earns the majority
of its income from advertising revenue.

        Eastman Kodak is a company founded in 1889 whose
business involves the development of cameras, film and related
products.  In 2001, Eastman Kodak acquired Ofoto, Inc. as a
wholly-owned subsidiary.  In 2005, Ofoto, Inc. changed its name
to Kodak Imaging Network and the online photography service
became known as KODAK Gallery.  KODAK Gallery offers its
customers the ability to upload their personal digital
photographs, create and store albums to share with family and
friends, and to order prints of and products containing their
digital photographs.  Effective January 21, 2009, Photobucket
and Kodak Imaging Network entered into a Photo Print and

6

Merchandise Agreement (the "Agreement"), which allowed
Photobucket users to print images obtained from Photobucket on
products available through KODAK Gallery.  Eastman Kodak was not
a party to the Agreement.

        At the time this action was commenced, Photobucket
allowed users to submit photos to Photobucket's former business
partner, Kodak Imaging Network, to create prints and other items
incorporating the photographs.  Photobucket states that it did
not control the Kodak Defendants' activities pursuant to this
relationship and that it was not involved in the Kodak
Defendants' fulfillment of orders.  Photobucket also states that
it played no role in a user's decision to access the Kodak
Defendants' services and no role in the user's selection of
images for which the user desired the Kodak Defendants'
services.  Wolk disputes this characterization of the
relationship between Photobucket and the Kodak Defendants,
stating that Photobucket understood the relationship under the
Agreement between Photobucket and Kodak Imaging Network to be a
partnership.  Photobucket contends that it has referred to Kodak
Imaging Network colloquially as its former business "partner,"
but disputes the characterization as to how it understood the
relationship.  Photobucket disputes Wolk's contention that

7

Photobucket had the ability to control the activities of the
Kodak Defendants.  Photobucket also avers that Photobucket's
financial benefit from its business relationship with the Kodak
Defendants was not contingent on the particular images submitted
to Kodak Imaging Network by users.  Rather, Photobucket received
the same payment for any image printed by a Kodak Imaging
Network user, regardless of content.  The Kodak Defendants state
that, under the Agreement between Kodak Imaging Network and
Photobucket, Kodak Imaging Network was obligated to pay
Photobucket 50% of "net profits," meaning total monthly gross
revenue less certain expenses.

Photobucket's website includes "Terms of Use" that are
available to users of the website.  Under the Terms of Use,
Photobucket users "represent and warrant that . . . the posting
and use of your Content on or through the Photobucket Services
does not violate the privacy rights, publicity rights,
copyrights, contract rights, intellectual property rights or any
other rights of any person."  In addition, the Terms of Use
state:

> **Protecting Copyrights and Other Intellectual Property**.
> Photobucket respects the intellectual property of
> others, and requires that our users do the same.  You

8

> may not upload, embed, post, email, transmit or
> otherwise make available any material that infringes
> any copyright, patent, trademark, trade secret or
> other proprietary rights of any person or entity.
> Photobucket has the right to terminate the Membership
> of Infringers.  If you believe your work has been
> copied and posted on or through the Photobucket
> Services in a way that constitutes copyright
> infringement, please follow the procedures set forth
> in the Photobucket copyright and IP Policy.

The Plaintiff states that Photobucket does not require
perspective users to read the Terms of Use in order to register
as a user.  Photobucket does not dispute this fact insofar as
Photobucket only requires users to agree to its Terms of Use in
order to register, and Photobucket has no way of requiring users
to actually read the terms.

Photobucket states that it has taken steps in
accordance with the Digital Millennium Copyright Act (the
"DMCA") that enable copyright owners who believe their rights
are being infringed by Photobucket users to notify Photobucket
and have their content removed.  According to Photobucket, the
website advises visitors to the website how to complain if they
believe their rights are being infringed and, on every page
where an image is displayed, there is a link allowing viewers to
"report inappropriate content."  Users who click this link are

9

prompted to view Photobucket's "Copyright and Intellectual
Property Policy" and are directed to send Photobucket a notice
of infringement, or "take-down notice." According to
Photobucket, the website provides instructions for users to send
the take-down notice, informing users of the elements required
under the DMCA to provide Photobucket with the information
necessary to remove the infringing material. Among other
things, the instructions state: "Identify the material or link
you claim is infringing (or the subject of infringing activity)
and that access to which is to be disabled, including at a
minimum, if applicable, the URL of the link shown on the
Photobucket website where such material may be found." The
instructions also designate an agent to receive notices of
alleged infringement. Photobucket has stated that staff members
review each take-down notice to ensure that the copyright holder
has provided the specific URL for each allegedly infringing
image because, if a copyright holder provides only an image, the
website does not have the capability to search the 9 billion
images and videos for infringing material. According to
Photobucket, if a take-down notice does not provide the URL for
the allegedly infringing content, Photobucket staff members
contact the copyright holder to request the information.

10

The Plaintiff states that she has limited knowledge of computers and has no formal education in computers or computer science.  The knowledge she does have of computers has come from using a personal computer and not from formal computer training. Photobucket does not dispute this fact, but highlights that Wolk, via a notices sent using Photobucket's online reporting system as early as May 2008 and in emails to Defendants' counsel, has proven herself able to ascertain and report to Photobucket alleged infringements of her work by URL, the specific character string that constitutes a reference to an Internet resource, and that Wolk operates an online retail store.  Wolk states that when she first noticed Photobucket, she did not know what a URL was or how it functioned in computer systems.

According to Photobucket, if a take-down notice with a URL is received, Photobucket removes the infringing images and provides the copyright holder with an email informing them that the content has been removed.  An email is also sent to the user who posted the allegedly infringing image to allow the user to refute the copyright holder's claim of infringement. Photobucket states that it has a policy of banning repeat offenders from using the website.

11

Wolk has stated that the Photobucket software offers tools to allow its users to defeat copyright holders' watermark. Photobucket does not dispute that the software offers editing tools, but rejects the characterization that these tools are provided to allow customers to defeat a copyright owner's watermark. Wolk states that Photobucket's search function can, in some categories, cause a user to have search results with more than 70% of the images displayed being protected by copyright. Photobucket disputes this fact and states that the website's search function is entirely dependent on information supplied by the Photobucket users who post the material. Wolk avers that Photobucket received a direct financial benefit from the alleged copyright infringement of her art and images. Photobucket disputes this fact, stating that it received the same share of profits realized by Kodak for infringing and non-infringing images and its revenues were in no way enhanced by or dependent on the allegedly infringing nature of any particular image.

Wolk has contended, and Photobucket does not dispute, that users of Photobucket have copied, displayed and modified Wolk's copyrighted material, and Plaintiff has not given

12

approval for any of these users to copy, display, modify or
otherwise use her art.  The Plaintiff states that products have
been made using her images by Kodak pursuant to the Agreement
with Photobucket, a fact Photobucket does not dispute to the
extent such products were ordered by Wolk, her proposed expert
Dr. Robert Sarvis or her proposed expert's assistant Nick
Virgilio.  The Kodak Defendants aver that, during discovery in
this action, the Kodak Defendants first became aware of three
orders placed through KODAK Gallery by Nick Virgilio for
products containing images he obtained from Photobucket at the
direct request of Wolk's potential expert witness, Dr. Robert
Sarvis.  Photobucket notes that the evidentiary record does not
include any such products having been made prior to the filing
of the Complaint.  According to Wolk, Kodak Imaging Network's
standard operating procedure is to visually review each image
product prior to production, a fact the Kodak Defendants
dispute.  With respect to Wolk's contention that Kodak Imaging
Network made products using her images, the Kodak Defendants
state that the three orders placed involving Wolk's images were
fulfilled by Kodak Imaging Network's third-party fulfillment
vendors without any human intervention by any employee of the
Kodak Defendants.

13

Wolk avers that Photobucket and the Kodak Defendants have transformed her images without license or approval and have transferred her images to subcontractors who have produced products using her images without license or her approval. Photobucket disputes these facts, stating that there is no evidence that Photobucket transforms images when users decide to have images made into prints or other Kodak products. Furthermore, Photobucket states that it does not transfer images, but rather allows users to select images which are then automatically sent to Kodak Imaging Network, and Photobucket had no knowledge of the images selected and plays no role in how the selected images are handled by the Kodak Defendants.

Wolk states that in late 2007 or early 2008, she became aware that her images were being copied, displayed and modified by users of Photobucket in violation of her copyrights. Photobucket does not dispute this fact, but notes that Wolk did not attempt to notify Photobucket of any purported infringements until May 9, 2008.  When Wolk did notify Photobucket, she did so through the website, clicking on the image and selecting an option which allowed her to "report inappropriate content." Wolk then selected the "infringes on my copyright" option, causing a button linking to Photobucket's "Copyright Policy" to

14

appear.  The Copyright Policy did not define URL as an
abbreviation for "uniform resource locator," but the policy did
indicate that a URL link should be included where applicable.
Wolk avers that, even after notifying Photobucket, her images
were still displayed, copied and being modified.  Photobucket
denies this contention, stating that when Wolk identified
infringing images to Photobucket via a proper notice with a URL,
the images were removed.

        On May 9, 2008, Wolk, in an initial notice, identified
an alleged infringement of a painting the Plaintiff called
"Sanctuary" and included a URL.  Wolk's notice stated, in part:
"Can you please remove my solely owned copyrighted painting of
'SANCTUARY' from this persons page.  I never gave permissions
for them or anyone to use my artworks in this fashion of
gliiter, graphics, sparkles, messeges, etc.  All my artworks are
copyrighted at the Library of Congress in Washington D.C. and I
am sole owner of all copyrights."  In a second notice sent on
the same day, Wolk identified two other images, along with URLs,
and stated: "My 'Tranquility' COPYRIGHTED PAINTING ( copyrighted
in Washington D.C. with the US Copyright Bureau) WHICH I AM SOLE
OWNER OF is in hennesey page of your website . . .
photobucket..please remove my artwork from this page . . ."

(ellipses in original) and "please remove these two paintings of mine that were altered without permissions and grabbed by your site person to give away or for you to sell as prints . . ."

According to Photobucket, on the following day, Photobucket advised Wolk that these notices did not fully comply with Photobucket's or the DMCA's requirements for take-down notices, and Wolk was provided with instructions on how to provide a complete and compliant notice.  On May 12, 2008, Wolk submitted to Photobucket revised notices identifying the images with URLs for the infringements she referenced in her May 9, 2008 notices.  The same day, Photobucket advised Wolk that it had removed the alleged infringing images.

On January 11, 2010, Gordon P. Black, Corporate Counsel for Applejack Art Partners, Inc. sent a take-down notice to Photobucket.  The notice explained that Applejack Art Partners, Inc. is the exclusive licensor of Wolk's artwork, and the notice listed 12 URLs and artwork titles for Photobucket to remove.  The same day, Photobucket faxed a response stating: "We received your fax requesting the removal of content infringing on Sheila Wolk's copyright.  Only one direct link was supplied, and we are unable to find the images by their titles alone.

16

Please provide the direct links to the images you need removed."
The response included instructions for how to find the direct
link.  Photobucket states that it never received a response to
this January 11, 2010 fax.

Wolk's initial complaint, filed on May 19, 2010, named
15 of her paintings that were allegedly infringed by
Photobucket.  At least six of these alleged infringements had
not been previously identified to Photobucket.  Wolk's initial
complaint did not provide any URLs for her alleged continuing
infringements.  On July 2, 1020, Wolk filed her Amended
Complaint that added 7 more titles of paintings.  The Amended
Complaint noted that, after filing the initial complaint but
prior to filing the amended complaint, Wolk provided an
additional listing of infringing images to Photobucket at
Photobucket's request.  According to Photobucket, the notice
provided 123 URL-specific addresses for alleged infringmenets
and, the day after the notice was received, Photobucket's then-
counsel responded, stating that Photobucket had removed 102 of
the images, but that additional information was required on the
remaining 21 images.  Photobucket states that Wolk never
responded to this request for additional information.

17

On July 17, 2010, following the filing of the Amended
Complaint, Wolk sent two emails to Photobucket's counsel
detailing more than 700 URL-identified alleged infringements.
On July 22, 2010, Photobucket's counsel responded: "I am writing
to report to you that Photobucket has taken down all of the
images you identify by specific URL in your two e-mails to me
dated July 17.  As we had previously requested, those URLs were
sufficiently complete to enable Photobucket to identify each of
the images that you were seeking to have taken down."

According to Wolk, sample searches she has conducted
have yielded approximately 3,000 infringements of her images.
Wolk states that this represents a small portion of the full
amount of infringements occurring on Photobucket of her images,
and that many or her infringements consist of multiple
duplicates of images, sometimes five or six copies of the same
image by a single user.  Photobucket does not dispute this fact,
but states that prior to Wolk filing this lawsuit, Photobucket
received no notice of these other purported infringements, and
these other purported infringements the Plaintiff has identified
post-date the filing of her initial complaint.  Photobucket
states that it has removed each infringing image when it
received a DMCA-complaint notice from Wolk.  Wolk states that

18

Photobucket has failed to implement and remove repeat

infringers, and that Wolk has identified 22 repeat infringers.

**The Applicable Standards[1]**

In addressing the present motions, the Court is

mindful that Wolk is proceeding pro se and that her submissions

are held to "less stringent standards than formal pleadings

drafted by lawyers . . . ." Hughes v. Rowe, 449 U.S. 5, 9, 101

S.Ct. 173, 66 L.Ed.2d 163 (1980) (quoting Haines v. Kerner, 404

U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)).  The courts

"construe the pleadings of a pro se plaintiff liberally and

interpret them to raise the strongest arguments they suggest."

Fuller v. Armstrong, 204 Fed. Appx. 987, 988 (2d Cir. 2006); see

also Lerman v. Bd. of Elections in City of N.Y., 232 F.3d 135,

---

[1]    As noted above, on April 11, 2011, Plaintiff filed a
"Motion To Investigate The Subornation And Acts Of Perjury By
The Defendants."  The Plaintiff's motion states that the
affidavit of a defense witness contained false information and
that, "on information and belief," the Defendants' attorneys
knowingly drafted the false affidavit and permitted it to be
filed with the Court.  Notwithstanding the seriousness of her
allegations, Wolk has provided no evidence to support her
contention that a witness committed perjury and that two
attorneys in this action committed subornation of perjury.  The
Plaintiff's accusations are completely unsupported, and the
motion is denied.

139-40 (2d Cir. 2000) ("Since most pro se plaintiffs lack
familiarity with the formalities of pleading requirements, we
must construe pro se complaints liberally, applying a more
flexible standard to evaluate their sufficiency that it would
when reviewing a complaint submitted by counsel."). However,
the courts will not "excuse frivolous or vexatious filings by
pro se litigants," Iwachiw v. New York State Dep't of Motor
Vehicles, 396 F.3d 525, 529 n.1 (2d Cir. 2005), and "pro se
status 'does not exempt a party from compliance with relevant
rules of procedural and substantive law.'"  Triestman v. Fed.
Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006) (quoting
Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983)).


## A. Applicable Standard on a Motion to Amend


Leave to amend should be "freely give[n] . . . when
justice so requires."  Fed. R. Civ. P. 15(a)(2).
Notwithstanding this lenient standard, the decision to grant or
deny leave to amend is within the discretion of the district
court.  See Forman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9
L.Ed.2d 222 (1962).  A district court may properly deny leave to
amend for "undue delay, bad faith or dilatory motive on the part
of the movant, repeated failure to cure deficiencies by

20

amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." See id.; see also SCS Commc'ns, Inc. v. Herrick Co., Inc., 360 F.3d 329, 345 (2d Cir. 2004) ("[U]nder Fed. R. Civ. P. 15(a), leave to amend a pleading may only be given when factors such as undue delay or undue prejudice to the opposing party are absent."). However, "mere delay is not, of itself, sufficient to justify denial of a Rule 15(a) motion." Parker v. Columbia Pictures Indus., 204 F.3d 326, 339 (2d Cir. 2000).

"Although Rule 15(a) governs the amendment of pleadings, Rule 16(b) also may limit the ability of a party to amend a pleading if the deadline specified in the scheduling order for amendment of the pleadings has passed." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 243 (2d Cir. 2007). Rule 16(b)(4) provides that "[a] schedule may be modified only for good cause[.]" The Second Circuit has held that, where a district court has set a deadline for amending pleadings, "the Rule 16(b) 'good cause' standard, rather than the more liberal standard of Rule 15(a), governs a motion to amend filed after the deadline[.]" Parker, 204 F.3d at 340.

21

"A finding of good cause depends on the diligence of the moving party." Grochowski v. Phoenix Constr., 318 F.3d 80, 86 (2d Cir. 2003) (affirming denial of leave to amend where the plaintiffs delayed more than one year, discovery had completed and a summary judgment motion was pending). "[T]he good cause standard is not satisfied when the proposed amendment rests on information 'that the party knew, or should have known, in advance of the deadline.'" Enzymotec Ltd. V. NBTY, Inc., 754 F. Supp. 2d 527, 536 (E.D.N.Y. 2010) (citation omitted) (finding plaintiff acted with diligence in seeking leave to amend within two months of discovering the facts underlying its new cause of action); but see Jackson v. Roslyn Bd. of Educ., 596 F. Supp. 2d 581, 586 (E.D.N.Y. 2009) (finding plaintiff's delay of nearly five months to evince "a lack of diligence").

Although the moving party's diligence is a district court's "primary consideration" in its Rule 16(b) good cause inquiry, a court "also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." Kassner, 496 F.3d at 244. An amendment is prejudicial to the non-moving party if it "would require the opponent to expend significant additional resources to conduct

22

discovery and prepare for trial or significantly delay the resolution of the dispute." Ruotolo v. City of New York, 514 F.3d 184, 192 (2d Cir. 2008).

## B. Applicable Standard on a Motion to Admit Expert Testimony

A district court can admit expert testimony from a person "qualified as an expert by knowledge, skill, experience, training, or education," assuming that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Rule 702 of the Federal Rules of Evidence, the Court's role is to determine whether the "expert" is qualified to testify as an expert. The Court conducts a two-part inquiry: (1) whether the expert used a reliable methodology; and (2) whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. Daubert, 509 U.S. at 592-93. The district court should not admit testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991).

23

## C. Applicable Standard on a Motion for Summary Judgment

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The courts do not try issues of fact on a motion for summary judgment, but, rather, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law."  Rodriguez v. City of N.Y., 72 F.3d 1051, 1060-61 (2d Cir. 1995).  Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case.  When no rational jury could find in favor of the nonmoving party because

24

the evidence to support its case is so slight, there is no
genuine issue of material fact and a grant of summary judgment
is proper." Gallo v. Prudential Residential Servs., L.P., 22
F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).  In
considering a summary judgment motion, the Court must "view the
evidence in the light most favorable to the non-moving party and
draw all reasonable inference in its favor, and may grant
summary judgment only when no reasonable trier of fact could
find in favor of the nonmoving party." Allen v. Coughlin, 64
F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation
marks omitted); see also Matsushita Elec. Indus. Co. v. Zenith
Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538
(1986).  However, "the non-moving party may not rely simply on
conclusory allegations or speculation to avoid summary judgment,
but instead must offer evidence to show that its version of
events is not wholly fanciful." Morris v. Lindau, 196 F.3d 102,
109 (2d Cir. 1999) (quotation omitted).


**Plaintiff's Motion to Amend the Complaint Is Denied**


As described above, motions to amend are typically
governed by Fed. R. Civ. P. 15(a), which requires a court to
find undue delay, bad faith or dilatory motive, repeated failure

25

to cure deficiencies by previously allowed amendments, or undue
prejudice to the opposing party to justify denial of a motion to
amend.  However, when a motion to amend is brought after the
deadline set for such motions by the scheduling order, the
motion is governed by Rule 16(b), which provides that scheduling
orders "shall not be modified except upon a showing of good
cause."  Fed. R. Civ. P. 16(b); Parker, 204 F.3d at 339-40.
Wolk's motion to amend was filed on June 26, 2011, nearly seven
months after the November 30, 2010 deadline set by the
scheduling order to which the parties stipulated.  Accordingly
the Rule 16(b) "good cause" standard will be applied.

          In her amended complaint, Wolk proposes to retract
Count VII, which alleges interference with advantageous business
relations by Kodak Gallery and the Kodak Defendants, and instead
bring a new Count VIII alleging unfair competition by Kodak
Gallery and the Kodak Defendants.  The new count alleges that
the Kodak Defendants, without authorization or license, copied,
distributed, produced and sold the Plaintiff's work, and that
the products the Kodak Defendants produce are in direct
competition with products produced under license using Wolk's
images by Wolk's licensees.  As such, the Kodak Gallery and the
Kodak Defendants directly interfere with the commercialization

of the Plaintiff's images, damaging the Plaintiff in the amount
of $1,500,000.  The proposed amended complaint also requests an
award of punitive damages in the amount of $6,000,000 for the
unfair competition of Kodak Gallery and the Kodak Defendants.

As described above, when a motion to amend is brought
after the deadline set by the Court, Fed. R. Civ. P. 16(b),
which provides that scheduling orders "shall not be modified
except upon a showing of good cause," applies.  "Good cause" is
not satisfied when the proposed amended complaint rests on
information that the movant "knew, or should have known, in
advance of the deadline."  Enzymotec, 754 F. Supp. 2d at 536.
Here, Wolk has not shown good cause to add a claim for common
law unfair competition.  There is no evidence that the unfair
competition claim turns on any facts that were not available to
Wolk when she commenced this action, as all the facts alleged in
the proposed Count VIII were included in her original amended
complaint.  As such, Wolk has not shown the "good cause"
necessary to allow her to amend her complaint after the November
30, 2010 deadline.

While it is true that Wolk is proceeding pro se, even
when her motion to amend is evaluated under the less stringent

27

standard provided by Fed. R. Civ. P. 15(a), her motion still
fails.  Wolk moved to amend her complaint in late June 2011.
Her motion comes after she previously amended her complaint,
after the November 30, 2010 deadline for amending the pleadings,
after the motions for summary judgment were filed and after the
June 15, 2011 discovery deadline.  Even under the more liberal
Rule 15(a) standard, it is improper to amend a complaint and add
a new claim in response to a motion for summary judgment when
discovery is complete.  See, e.g., AEP Energy Servs. Gas Holding
Co. v. Bank of Am., N.A., 626 F.3d 699, 726-27 (2d Cir. 2010)
(holding that leave to amend should be denied where motion to
amend was filed after defendant had filed summary judgment
papers based on existing claims); McCarthy v. Dunn & Bradstreet
Corp., 482 F.3d 184, 202 (2d Cir. 2007) ("Plaintiffs sought to
amend their complaint after an inordinate delay.  By that time,
discovery had closed, defendants had filed for summary judgment,
and nearly two years had passed since the filing of the original
complaint.  In light of this record, we conclude that the
district court did not exceed its discretion in denying
plaintiffs' leave to amend.").  Given that discovery has been
completed, it would be inappropriate to allow the Plaintiff to
amend her complaint at this stage of the litigation.

The Plaintiff cannot meet either the "good cause" standard under Fed. R. Civ. P. 16(b) or the less stringent standard provided under Fed. R. Civ. P. 15(a).  Accordingly, her motion to amend the complaint is denied.

**Plaintiff's Motion to Admit Expert Testimony Is Denied**

Plaintiff has filed a motion to admit the expert testimony of Dr. Robert Sarvis.  In her motion, Wolk states that Dr. Sarvis holds a Doctor of Business Administration, has previously studied probability and statistics, has taught undergraduate and graduate level courses in business and statistics at accredited universities and has served as a consultant on various financial and copyright issues for over five years.  Wolk's motion states:

> The methodology of statistical analysis employed by Dr. Sarvis is generally accepted, reliable, and well tested in the scientific community.  The approach is peer reviewed and included in most textbooks on the subject of population sampling and statistical analysis.  He bases his conclusions and opinions upon the result of these statistical surveys for which standard deviation and statistical error can and are measured.

29

Wolk states that Dr. Sarvis' testimony is important to
adjudicating this case because Dr. Sarvis can address the
irreparable harm to the Plaintiff resulting from the Defendants'
alleged actions.  Furthermore, Wolk states that Dr. Sarvis will
establish that the solicitation and display of copyrighted
images by Photobucket is an integral part of Photobucket's
business and that the Defendants "turned a blind eye" to the
copying, displaying, transfer and reproduction of the
Plaintiff's artwork.  The Plaintiff's motion does not include
any written report, opinion, affidavit or any statement from Dr.
Sarvis.

          "Whether a purported expert witness is qualified . . .
is a 'threshold question' to be resolved prior to other
inquiries."  See Arista Records LLC v. Lime Group LLC, No. 06 CV
5936(KMW), 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011) (citing
Nimley v. City of N.Y., 414 F.3d 381, 396 n.11 (2d Cir. 2005).
The only evidence Plaintiff has submitted attesting to Dr.
Sarvis' qualifications is his "Vita," which describes Dr.
Sarvis' educational background, teaching experience and business
and consulting experience.  The Defendants argue that this vita
provides insufficient evidence of Dr. Sarvis' qualifications in
the field of statistics, noting that Dr. Sarvis' vita does not

30

list any degree or professional certification in statistics, nor does it list any published works or testimony presented in the field of statistics.  However, Dr. Sarvis' vita does include courses in "business statistics" and states that he has experience teaching statistics at the undergraduate and graduate levels.  As Judge Weinstein instructs, "The standard for qualifying expert witnesses is liberal.  This generosity extends to substantive as well as formal qualifications."  4 Weinstein's Federal Evidence, § 702.04[1].  Accordingly, Dr. Sarvis' testimony will not be excluded on grounds that his qualifications are insufficient.

The Plaintiff's motion to admit Dr. Sarvis' testimony is denied because the Plaintiff has failed to provide the Court with information sufficient to conduct a Daubert analysis. Although discovery in this matter has concluded, no expert report or statement for the basis of Dr. Sarvis' opinions has been provided.  While Plaintiff's failure to serve an expert report by the April 30, 2011 deadline may be excused on account of the then-pending (and ultimately unsuccessful) motion to compel the production of documents to Dr. Sarvis, the Plaintiff had ample time following the resolution of that motion to serve a report or seek additional extensions.  The Court's August 25,

2011 order provided the Plaintiff until September 15, 2011 to
file a motion to admit Dr. Sarvis as an expert under Daubert,
but the Plaintiff did not serve any report.

Under Daubert, the trial court is tasked with
"ensuring that an expert's testimony both rests on reliable
foundation and is relevant to the task at hand." Daubert, 509
U.S. at 597.  The proponent of expert testimony bears the
burden, by preponderance of the evidence, to demonstrate that
the admissibility requirements of Rule 702 are satisfied.  See
In re NYSE Specialists Litig., 260 F.R.D. 55, 65 (S.D.N.Y. 2009)
(citing United States v. Williams, 506 F.3d 151, 160 (2d Cir.
2007)).  Fed. R. Evid. 702 provides:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in
> the form of an opinion or otherwise if:
> (a)  the expert's scientific, technical, or other
>      specialized knowledge will help the trier of fact to
>      understand the evidence or to determine a fact in
>      issue;
> (b)  the testimony is based on sufficient facts or data;
> (c)  the testimony is the product of reliable principles
>      and methods; and
> (d)  the expert has reliably applied the principles and
>      methods to the facts of the case.

In addition to the requirements of Fed. R. Evid. 702, Daubert
enumerates other factors which bear on the reliability of

32

proposed expert testimony, including (i) whether the theory or
technique can be tested; (ii) whether the theory or technique
has been subject to peer review; (iii) the technique's "known or
potential rate of error" and "the existence and maintenance of
standards controlling the technique's operation"; and (iv)
whether a particular technique or theory has gained general
acceptance in the scientific community.  See Daubert, 509 U.S.
at 593-94; Williams, 506 F.3d at 160.


        Here, the Plaintiff asks the Court to conduct a
Daubert analysis based solely on her descriptions of Dr. Sarvis'
conclusions.  No explanation has been provided regarding Dr.
Sarvis' methods, excepting the Plaintiff's contention that
"[t]he methodology of statistical analysis employed by Dr.
Sarvis is generally accepted, reliable, and well tested in the
scientific community."  Even if this contention is accepted, the
Plaintiff's motion fails to allege any facts which support the
methodology's acceptance in the scientific community.  The
motion does not identify any peers who have reviewed the
methodology or any data to support the methodology's acceptance
or reliability.  The motion fails to present sufficient facts or
data upon which Dr. Sarvis' opinions are based, a sufficient
description of the principles and methods Dr. Sarvis' employed

33

or a description of how Dr. Sarvis' applied his methodology to the facts of the case.  Because the Plaintiff's motion fails to meet the criteria established in Fed. R. Evid. 702 or Daubert, the Plaintiff's motion to admit expert testimony must be denied.

**Plaintiff's Motions for Partial Summary Judgment Against the Kodak Defendants and Summary Judgment Against Photobucket Are Denied, and Defendants' Motions for Summary Judgment Are Granted**

On May 2, 2011, Wolk moved for partial summary judgment against the Kodak Defendants.  The Kodak Defendants have opposed the Plaintiff's motion for partial summary judgment and have filed a cross-motion for summary judgment on all counts.  In addition, Photobucket has filed a motion for summary judgment seeking dismissal of all the Plaintiff's claims, to which Wolk has responded with a cross-motion for summary judgment against Photobucket.  For the reasons stated below, the Plaintiff's motions for partial summary judgment against the Kodak Defendants and summary judgment against Photobucket are denied, and the Defendants' motions for summary judgment are granted.

**A. The Plaintiff's Motion For Partial Summary Judgment With Respect To The Kodak Defendants Is Denied, And The Kodak Defendants' Motion For Summary Judgment Is Granted**

34

Wolk has moved for partial summary judgment against
the Kodak Defendants, seeking a declaratory ruling that the
Kodak Defendants infringed on the copyrights of the Plaintiff,
that the Kodak Defendants are not a "service provider" or, in
the alternative, are not protected by the safe harbor provisions
of the DMCA, that the Kodak Defendants' infringement was willful
and that the Plaintiff is entitled to statutory damages under 17
U.S.C. §§ 504(a)(2), (c)(1) and (c)(2) per work of art
infringed.  In the Complaint, there are four counts pertaining
to the Kodak Defendants: Count I requesting a declaratory
judgment that the Defendants' infringed upon the Plaintiff's
copyrights, Count II requesting a permanent injunction, Count VI
alleging direct liability for infringement by Kodak Gallery and
the Kodak Defendants and Count VII alleging interference with
advantageous business relations by Kodak Gallery and the Kodak
Defendants.  In her reply brief in support of the motion for
partial summary judgment, the Plaintiff has stated that she
waives her claims for tortious interference against the Kodak
Defendants.  Accordingly, the remaining question relevant to
whether the Kodak Defendants can be held liable is whether the

35

Kodak Defendants engaged in direct infringement of Wolk's copyrighted images.[2]

In her motion, Wolk details ten instances where the Kodak Defendants allegedly made, sold and shipped products using Wolk's copyrighted images without obtaining Wolk's permission or a valid license. Because the Copyright Act, 17 U.S.C. §§ 106(1), (2) and (5), grants the owner of the copyright exclusive rights to reproduce, produce derivative works and distribute the copyrighted images, Wolk argues that the Kodak Defendants' creation and distribution of these products causes them to be liable for statutory damages as set forth in 17 U.S.C. § 504(a)(2), (c)(1) and (c)(2). Although direct infringement is not a strict liability tort, Wolk alleges that the Kodak Defendants' infringing activity meets the level of "volition" required under the Second Circuit case of Cartoon Network LP v. CSC Holdings, Inc., 536 F.3d 121, 130-31 (2d Cir. 2008) because the Kodak Defendant's made copies of her images and transformed

---

[2]    While a defendant may be held secondarily liable for another's infringement, see Sony Corp. of Am. v. Universal Studios, Inc., 464 U.S. 417, 434-35, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), Wolk has not pled any form of secondarily liability with respect to the Kodak Defendants.  Wolk has pled various forms of secondary liability against Photobucket.  Accordingly, it is assumed that the only form of infringement Wolk alleges against the Kodak Defendants is direct infringement.

them into products, thereby changing the Kodak Defendants'
status from being "passive providers of a space in which
infringing activities happen to occur to active participants in
the process of copyright infringement." Arista Records LLC v.
Usenet.com, Inc., 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009).
Wolk also argues that, unlike Cartoon Network where the
defendants made a single copy, the Kodak Defendants have made
multiple copies, modifying Wolk's artwork to conform to a
particular product.  As such, Wolk concludes that the Kodak
Defendants have directly infringed.

Wolk avers that the Kodak Defendants do not qualify
for the safe harbor the DMCA affords to "service providers"
where incidental infringement occurs when these service
providers perform Internet functions, such as providing storage
at the discretion of a user.  The Plaintiff further contends
that Eastman Kodak is vicariously liable because Kodak Imaging
Network is a wholly-owned subsidiary of Eastman Kodak.

Wolk states that she is entitled to statutory damages
and that, pursuant to 17 U.S.C. § 504(c)(1), the Kodak
Defendants are obligated to pay damages on a per image basis.
The Plaintiff notes that statutory damages are awarded when no

37

actual damages are proven or actual damages and profits are
difficult or impossible to calculate, and, in this case, the
Kodak Defendants have either intentionally or with wanton
disregard failed to keep and maintain the records necessary to
calculate damages.  Wolk contends that, since the Kodak
Defendants cannot demonstrate either that they were unaware or
that they had no reason to believe that their acts constituted
infringement, the Kodak Defendants' are strictly liable, their
infringement is considered "willful" under the statute and the
district court has discretion to increase the damages award up
to $150,000 per "willfully" infringed work, pursuant to 17
U.S.C. § 504(c)(2).  In support of this argument, Wolk notes
that Dr. Sarvis and his assistant were able to purchase products
that contained Wolk's copyrighted images after this action had
been filed, and, under applicable Second Circuit precedent,
where sophisticated defendants knew or should have known that
their conduct was infringing, those defendants infringement is
classified as "willful."  See Twin Peaks Prods., Inc. v.
Publications Int'l, Ltd., 996 F.2d 1366, 1382 (2d Cir. 1993).
The Plaintiff argues that this is a case where the imposition of
statutory damages is necessary as a deterrent to protect
artists, who often have limited resources and are unable to
protect their rights.

38

"To establish a claim of copyright infringement, a plaintiff must establish (1) ownership of a valid copyright, and (2) unauthorized copying or a violation of one of the other exclusive rights afforded copyright owners pursuant to the Copyright Act." Byrne v. British Broad Corp., 132 F. Supp. 2d 229, 232 (S.D.N.Y. 2001) (citing Twin Peaks, 996 F.2d at 1372). Direct liability requires "volitional conduct" that "causes" the infringement.  See Cartoon Network, 536 F.3d at 131.  In Cartoon Network, the Second Circuit addressed a case involving Cablevision's Remote Storage Digital Video Recorder system, which allowed cable television subscribers to select programs to be reproduced onto Cablevision's hard drives for later playback. See Cartoon Network, 536 F.3d at 123-25, 130.  In determining whether Cablevision could be held liable for creating an unauthorized reproduction of a television program, the Second Circuit adopted the "volition standard", noting that:

[T]o establish direct liability under . . . the [Copyright] Act, something more must be shown than mere ownership of a machine used by others to make illegal copies.  There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner.  Id. at 130.

39

In deciding the case, the Second Circuit held that
"Cablevision's conduct in designing, housing and maintaining a
system that exists only to produce a copy" was not sufficiently
proximate to any instance of unauthorized copying instigated by
a Cablevision customer to hold Cablevision liable as a direct
infringer.  Id. at 131.  Rather, "by selling access to a system
that automatically produces copies on command, Cablevision more
closely resembles a store proprietor who charges customers to
use a photocopier on his premises and it seems incorrect to say,
without more, that such a proprietor 'makes' any copies when his
machines are actually operated by his customers."  Id. at 132.
Accordingly, the Second Circuit reversed the summary judgment
that had been entered against Cablevision.  Id.


        Applying Cartoon Network to the Kodak Defendants,
there is no evidence of volitional conduct, thereby preventing
Wolk from establishing direct liability.  Wolk has presented two
theories to hold the Kodak Defendants liable for infringement:
first, the Kodak Defendants infringed because they reproduced
her images onto various products; and second, the Kodak
Defendants infringed because an electronic preview page is
generated on the Kodak Gallery website when a user is making an
order for a product bearing an image imported from the

                                40

Photobucket website.  However, the evidence the Kodak Defendants

have offered, which Wolk has not rebutted, is that the transfer

of information about an order from the KODAK Gallery website to

the fulfillment vendor is done electronically through an

automated computer system and that all of the information

displayed on the KODAK Gallery website, including the simulation

of products containing the Photobucket images, is done

electronically.  There is no dispute that any reproduction,

display or transmission of the Plaintiff's images by or through

the KODAK Gallery website is an automated process with no human

intervention by any employee of the Kodak Defendants.  The fact

that Wolk's images are copied into product simulations in

addition to being transmitted to fulfillment vendors does not

constitute a volitional act where the copying is automated.  See

Disney Enters., Inc. v. Hotfile Corp., No. 11-20427-CIV-JORDAN,

2011 WL 2899374, at *5 (S.D. Fla. July 8, 2011) ("Finally, the

plaintiffs contend that they have alleged a volitional act

because they have alleged that hotfile.com makes additional

copies once the copyrighted material is uploaded to the server.

This argument too fails, for courts have repeatedly held that

the automated conduct of software, unaided by human

intervention, is not 'volitional.'").  Furthermore, the display

of copyrighted images on a defendant's website does not

41

demonstrate volition.  See CoStar Grp., Inc. v. LoopNet, Inc.,
373 F.3d 544, 550 (4th Cir. 2004) (holding that Internet service
provider did not engage in volitional conduct sufficient for
copyright liability where user of service posted copyrighted
images that were displayed on defendant's website) (cited by
Cartoon Network, 536 F.3d at 130-31).  Because the Plaintiff has
failed to establish any volitional conduct, the Kodak Defendants
are not liable for direct infringement.

        Because the Kodak Defendants cannot be held liable for
direct infringement, the issues of whether they fall under the
DMCA's "safe harbor" provision, whether their alleged
infringement was "willful" under the statute and whether Wolk is
entitled to damages per work of art infringed need not be
reached.  Similarly, although the Kodak Defendants dispute
whether the Plaintiff has properly asserted a claim of vicarious
liability against Eastman Kodak, there is no need to address
this issue because the Plaintiff has not established liability
on the part of either of the Kodak Defendants.

**B. The Plaintiff's Cross-Motion For Summary Judgment Against
   Photobucket Is Denied, And Photobucket's Motion For Summary
   Judgment Is Granted**

There are five counts in the Complaint applicable to Photobucket: Count I requesting a declaratory judgment that Photobucket has infringed on Wolk's copyrights, Count II requesting a permanent injunction preventing Photobucket from continuing to infringe, Count III alleging contributory copyright infringement, Count IV alleging vicarious copyright infringement and Count V alleging direct infringement.  On September 23, 2011, Photobucket filed its motion for summary judgment with respect to all counts.  In response, Wolk filed her opposition to Photobucket's motion as well as a cross-motion seeking summary judgment against Photobucket.  For the reasons stated below, Wolk's cross-motion for summary judgment fails, and Photobucket's motion for summary judgment is granted with respect to all counts.

### 1. Photobucket Cannot Be Held Liable Because It Falls Within The DMCA's "Safe Harbor"

Photobucket cannot be held liable for infringing upon Wolk's copyrighted work because Photobucket falls within the DMCA's "safe harbor," thereby protecting Photobucket against the Plaintiff's copyright infringement claims.

43

## A. Photobucket Meets The Threshold Requirements To Qualify For The DMCA's "Safe Harbor" Provisions

To qualify for the "safe harbor" provisions under the DMCA, a party must meet certain threshold requirements, including that the party (1) must be a "service provider" as defined by the statute; (2) must have adopted and reasonably implemented a policy for the termination in appropriate circumstances of users who are repeat infringers; and (3) must not interfere with standard technical measures used by copyright owners to identify or protect copyrighted works. Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090, 1099 (W.D. Wash. 2004), overruled on other grounds, Cosmetic Ideas, Inc. v. IAC/Interactivecorp., 606 F.3d 612 (9th Cir. 2010); IO Grp., Inc. v. Veoh Networks, Inc., 586 F. Supp. 2d 1132, 1142-43 (N.D. Cal. 2008).

Photobucket meets the applicable definition of a "service provider" under the DMCA. The DMCA includes two definitions of the term "service provider:"

> **(A)** As used in subsection (a), the term 'service provider' means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of

44

the user's choosing, without modification to the content of
the material as sent or received.
**(B)** As used in this section, other than in subsection (a),
the term 'service provider' means a provider of online
services or network access, or the operator of facilities
therefor, and includes an entity described in subparagraph
(A).

17 U.S.C. § 512(k)(1).  Because Photobucket is eligible under

the "safe harbor" contained in 17 U.S.C. § 512(c), the broader

definition included in 17 U.S.C. § 512(k)(1)(B) is applicable.

See IO Grp., 586 F. Supp. 2d at 1143 n.7.  The DMCA's definition

of "service provider" is intended to encompass a broad set of

Internet entities.  See Corbis, 351 F. Supp. 2d at 1100 ("This

definition encompasses a broad variety of Internet

activities.").  Courts have found services similar to

Photobucket, such as Youtube.com and Veoh.com, to be "service

providers" under the DMCA.  See Viacom Int'l, Inc. v. YouTube,

Inc., 718 F. Supp. 2d 514, 518 (S.D.N.Y. 2010); IO Grp., 586 F.

Supp. 2d at 1143.  Because Photobucket offers a site that hosts

and allows online sharing of photos and videos at the direction

of users, Photobucket, like YouTube.com or Veoh.com, qualifies

as a "service provider" under § 512(k)(1)(B).


         Photobucket has also adopted and reasonably

implemented a policy for the termination in appropriate

circumstances of users who are repeat infringers.  Pursuant to

17 U.S.C. § 512(i), to qualify for a safe harbor, a service

provider must demonstrate that it has "adopted and reasonably

implemented, and informs subscribes and account holders of the

service provider's system or network of, a policy that provides

for the termination in appropriate circumstances of subscribers

and account holders of the service provider's system or network

who are repeat infringers."  17 U.S.C. § 512(i)(1)(A); see also

Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1109 (9th Cir.

2007).  To fulfill the requirements of 17 U.S.C. § 512(i), a

service provider must (i) adopt a policy that provides for the

termination of service access for repeat copyright infringers;

(ii) inform users of the service policy; and (iii) implement the

policy in a reasonable manner.  Corbis, 351 F. Supp. 2d at 1100;

see also Perfect 10, 488 F.3d at 1109-15.


        In her opposition papers, Wolk has alleged that

Photobucket does not terminate repeat infringers and that

Photobucket has merely "given lip service to this and created a

paper policy it does not enforce."  The evidence, however,

establishes that Photobucket has developed a policy under which

copyright holders can submit a take-down notice and that this

policy was made available to the public on Photobucket's

46

website.  When Photobucket received Wolk's take-down notices,
both those that included URLs as well as those that did not,
Photobucket acted to remove the infringing material.  As such,
the evidence presented indicates that Photobucket has fulfilled
the requirements of 17 U.S.C. § 512(i), having adopted, informed
users of and reasonably implemented a policy of terminating
users who repeatedly infringe copyrights.

Photobucket also meets the third threshold
qualification, as it "accommodates and does not interfere with
standard technical measures."  17 U.S.C. § 512(i)(1)(B).  As
described by the Court in IO Group, "standard technical
measures" are defined as "technical measures that are used by
copyright owners to identify or protect copyrighted works" and
which have been developed pursuant to a broad consensus of
copyright owners and service providers in an open, fair,
voluntary, multi-industry standards process, are available to
any person on reasonable and nondiscriminatory terms and do not
impose substantial costs on service providers or substantial
burdens on their systems or networks.  See IO Grp., 586 F. Supp.
2d at 1142 n.6.

47

Wolk argues that, because Photobucket affords its users computer tools that allow users to obliterate, hide or crop out the copyright watermarks on the electronic images uploaded, Photobucket is precluded from using the DMCA "safe harbor." Wolk's contention is that Photobucket has developed these tools because, if users could not remove the watermark, Photobucket's business would suffer because those users who seek copyrighted art and photos would be unable to obtain them for free. However, the Plaintiff does not suggest that Photobucket advises or encourages its users to use the photo-editing tools to circumvent the copyright. The fact that the watermarks appear suggests that Photobucket does, indeed, accommodate "standard technical measures." While the Plaintiff argues that the editing software "interfere[s] with standard technical measures," it is not Photobucket, but rather users, who would use the editing tools to attempt to circumvent copyright protection measures that were already on the site. Accordingly, the editing tools Photobucket provides do not disqualify it from "safe harbor" eligibility.

### B. Photobucket Is Sheltered From Liability Under 17 U.S.C. § 512(c)

48

Once the threshold requirements are met, a party may be eligible for one or more of the four "safe harbor" provisions codified at 17 U.S.C. § 512(a) through § 512(d).  In this case, the most applicable "safe harbor" is that included in 17 U.S.C. §512(c):

**(c) Information residing on systems or networks at direction of users.**

> **(1) In general.** A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider-
>
> > **(A)(i)** does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
> >
> > **(ii)** in the absence of such actual knowledge, is not aware of facts or circumstances for which infringing activity is apparent; or
> >
> > **(iii)** upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
> >
> > **(B)** does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
> >
> > **(C)** upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that

49

is claimed to be infringing or to be the subject of infringing activity.

**(2) Designated agent.** The limitations on liability established in this subjection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:

**(A)** the name, address, phone number, and electronic mail address of the agent.

**(B)** Other contact information which the Register of Copyrights may deem appropriate.

The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, in both electronic and hard copy formats, and may require payment of a fee by service providers to cover the costs of maintaining the directory.

Here, Photobucket has fulfilled all the statutory conditions necessary to be sheltered from liability.

> i.  **Photobucket Did Not Have Actual Knowledge Of The Infringing Activity, Was Not Aware Of Any Facts From Which Infringing Activity Was Apparent And Expeditiously Removed Infringing Material When It Obtained Sufficient Information**

As described in the statute above, to meet the eligibility requirements of the 17 U.S.C. § 512(c) "safe harbor"

provision, Photobucket must show, <u>inter alia</u>, that it did not have actual knowledge that the material or an activity using the material on the system or network is infringing and was not aware of facts or circumstances from which infringing activity is apparent.  Where a service provider does obtain either actual or apparent knowledge, it may still enjoy the "safe harbor" if it acts expeditiously to remove or disable access to the infringing material.

There is no evidence that Photobucket had actual or constructive knowledge of the copyright infringement Wolk alleges.  To be DMCA-compliant so as to constitute notice sufficient to give knowledge to a service provider of infringement, the notice a copyright owner submits to the service provider must include six elements: (1) a physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed; (2) identification of the copyrighted work claimed to have been infringed; (3) identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material; (4) information reasonably sufficient to

51

permit the service provider to contact the complaining party;
(5) a statement that the complaining party has a good faith
belief that use of the material in the manner complained of is
not authorized by the copyright owner, its agent, or the law;
and (6) a statement that the information in the notification is
accurate, and under penalty of perjury, that the complaining
party is authorized to act on behalf of the copyright owner.
See 17 U.S.C. § 512(c)(3); see also Hendrickson v. eBay, Inc.,
165 F. Supp. 2d 1082, 1089 (C.D. Cal. 2001).


        As described above, prior to the commencement of this
litigation, Wolk provided Photobucket with fifteen notices of
the infringement of nine different works.  Eleven of these
notices were not DMCA-compliant.  Wolk argues that these fifteen
notices serve as DMCA-compliant notice of any and all other
unidentified alleged infringements of these nine works that may
appear on the Photobucket site, thereby providing Photobucket
with the requisite knowledge necessary to require it to remove
those alleged infringements.  The Plaintiff, however, is
incorrect.  Section 512(c)(3)(A)(iii) and 512(c)(3)(A)(v)
require a DMCA-compliant take-down notice to provide
"[i]dentification of the material that is claimed to be
infringing or to be the subject of infringing activity and that

52

is to be removed or access to which is to be disabled, and
information reasonably sufficient to permit the service provider
to locate the material" and a "statement that the complaining
party has a good faith belief that the use of the material in
the manner complained of is not authorized by the copyright
owner, its agent, or the law."  17 U.S.C. §§ 512(c)(3)(A)(iii),
512(c)(3)(A)(v).  "An example of such sufficient information
would be a copy or description of the allegedly infringing
material and the so-called 'uniform resource locator' (URL)
(i.e. web site address) which allegedly contains the infringing
material." Viacom, 718 F. Supp. 2d at 521.  In Viacom, the
Court rejected the plaintiffs' complaint that the service
provider, YouTube, "remove[d] only the specific clips identified
in DMCA notices, and not other clips which infringe the same
works." Id. at 528.  The same reasoning applies here:
Photobucket cannot be held liable for its failure to remove
images for which the Plaintiff failed to provide proper notice.

Although Wolk advocates for a system where one notice
of infringement would apply to all instances of that image
appearing on the website, it would be irresponsible for
Photobucket to assume infringement in the way the Plaintiff
describes.  Because Wolk and other copyright holders retain the

right to license their work, a policy under which Photobucket
assumes infringement could result in Photobucket unlawfully
blocking others from uploading images to which they hold valid
licenses. Notices that do not identify the specific location of
the alleged infringement are not sufficient to confer "actual
knowledge" on the service provider. See UMG Recordings, Inc. v.
Veoh Networks Inc., 665 F. Supp. 2d 1099, 1108-09 (C.D. Cal.
2009) ("If merely hosting user-contributed material capable of
copyright protection were enough to impute actual knowledge to a
service provider, the section 512(c) safe harbor would be a dead
letter because vast portions of content on the internet are
eligible for copyright protection."); Hendrickson, 165 F. Supp.
2d at 1082 ("[DMCA] expressly provides that if the copyright
holder's attempted notification fails to 'comply substantially'
with the elements of notification described in subsection
(c)(3), that notification shall not be considered when
evaluating whether the service provider had actual or
constructive knowledge of the infringing activity . . .").

     In those circumstances where Wolk validly notified
Photobucket of infringing activity, it is undisputed that
Photobucket has acted promptly to take down the infringing
material in an expeditious manner. Even in instances where

54

notices were non-compliant, Photobucket acted to remove the
material.

Accordingly, because Photobucket did not have
knowledge that the material or an activity using the material on
the system or network was infringing, was not aware of facts or
circumstances from which infringing activity is apparent and
acted expeditiously to remove infringing material when it became
aware, Photobucket is entitled to the protection of the "safe
harbor" afforded under 17 U.S.C. § 512(c).

> ### ii.  Photobucket Does Not Have The "Right And Ability To Control" And Does Not Receive Direct Financial Benefit From The Alleged Infringing Activity

Section 512(c)(1)(B) conditions the availability of
the "safe harbor" on the service provider not receiving "a
financial benefit directly attributable to the infringing
activity, in a case in which the service provider has the right
and ability to control such activity."  In other words, the
service provider complies with the provision if it "either does
not have the right and ability to control the infringing
activity, or – if it does – that it does not receive a financial

55

benefit directly attributable to the infringing activity." IO
Grp., 586 F. Supp. 2d at 1146.

"[T]he right and ability to control infringing
activity, as the concept is used in the DMCA, cannot simply mean
the ability of a service provider to remove or block access to
materials posted on its website or stored on its system."
Corbis, 351 F. Supp. 2d at 1110.  Instead, such a right and
ability to control must take the form of prescreening content,
rendering extensive advice to users regarding content and
editing user content.  See id.  In this case, Photobucket does
not engage in such activities, and, considering that millions of
images are uploaded daily, it is unlikely that this kind of
prescreening is even feasible.  Cf. IO Grp., 586 F. Supp. 2d at
1153 (where "hundreds of thousands of video files" had been
uploaded to a website, the Court found that "no reasonable juror
could conclude that a comprehensive review of every file would
be feasible").

There is also no evidence that Photobucket receives "a
financial benefit directly attributable to the infringing
activity."  As noted by the Ninth Circuit in Perfect 10, where
there is no evidence in the record that the service provider

56

"attracted or retained subscriptions because of the infringement
or lost subscriptions because of its eventual obstruction of the
infringement," no reasonable jury could conclude that the
service provider received a direct financial benefit from
providing access to the infringing material.  Perfect 10, 488
F.3d at 1118.  While Wolk alleges that Photobucket receives a
financial benefit from infringements from a profit-sharing
relationship with the Kodak Defendants, there is no evidence
indicating that either the Kodak Defendants or Photobucket
capitalizes specifically because a given image a user selects to
print is infringing.  The Defendants' profits are derived from
the service they provide, not a particular infringement.
Furthermore, Photobucket has no knowledge of which images users
may select to send to the Kodak Defendants to be printed, and,
as such, Photobucket has no ability to control whether users
request that infringing material be printed.

       Because the evidence does not support a finding that
Photobucket received "a financial benefit directly attributable
to the infringing activity, in a case in which the service
provider has the right and ability to control such activity,"
the limitation to the "safe harbor" provided in 17 U.S.C. §
512(c)(1)(B) does not apply to Photobucket.

### iii. Upon Notification Of Claimed Infringement, Photobucket Responded To Remove The Allegedly Infringing Material

To be eligible for the "safe harbor" provided in 17 U.S.C. § 512(c), it must be shown that a service provider "upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity."  As described above, whenever Wolk had validly notified Photobucket of infringing activity, Photobucket acted promptly to take down the infringing material in an expeditious manner.  In those instances where Wolk's notices were non-DMCA compliant, Photobucket still acted to remove the material to the best of its ability.

### iv. Photobucket Has Designated An Agent To Receive Notifications Of Claimed Infringements

Finally, to be eligible for the "safe harbor" under 17 U.S.C. § 512(c), a service provider must designate an agent to receive DMCA notifications.  The statute requires that the service provider make "available through its service, including on its website in a location accessible to the public, and by

58

providing to the Copyright Office, substantially the following
information . . . the name, address, phone number, and
electronic mail address of the agent." 17 U.S.C. § 512(c)(2).
Here, the evidentiary record includes instructions Photobucket
provided on its website that included the following contact
information for Photobucket's designated copyright agent:

> Copyright Agent
> Photobucket.com, Inc.
> PO Box 13003
> Denver, CO 80201
> abuse@photobucket.com
> Fax: (303) 395-1165

Although this contact information does not include a name or
phone number, the statute mandates that the service provider
provide "substantially the following information," and by
including the address, email address and fax number of the
copyright agent, Photobucket has included sufficient information
to have designated an agent.

### v.   Photobucket Has No Duty To Police Its Website For Infringements

As described above, Photobucket is a website that
consists of over 9 billion images and videos.  Under the
Plaintiff's theory, Photobucket would be required to police its

59

website for infringing copies of her work wherever they may
appear once she has provided a DMCA-compliant notice.  However,
under 17 U.S.C. § 512(m), the DMCA limits Photobucket's
obligations:

> **(m) Protection of privacy.** Nothing in this section shall be
> construed to condition the applicability of subsections (a)
> through (d) on-
>
> > **(1)** a service provider monitoring its service or
> > affirmatively seeking facts indicating infringing
> > activity, except to the extent consistent with a
> > standard technical measure complying with the
> > provisions of subsection (i); or
> >
> > **(2)** a service provider gaining access to, removing, or
> > disabling access to material in cases in which such
> > conduct is prohibited by law.

"The DMCA is explicit: it shall not be construed to condition
'safe harbor' protection on 'a service provider monitoring its
service or affirmatively seeking facts indicating infringing
activity . . . ."  Viacom, 718 F. Supp. 2d at 524 (citing
Perfect 10, 488 F.3d at 1113).  Thus, the DMCA does not require
the policing the Plaintiff suggests.

Because Photobucket fulfills all the required
provisions of the statute and because the DMCA does not require
the active enforcement the Plaintiff has described, Photobucket
is able to take advantage of the "safe harbor" provision under

60

17 U.S.C. § 512(c).  Accordingly, Photobucket "shall not be liable for monetary relief, or . . . for injunctive relief or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."  17 U.S.C. § 512(c)(1).

### 2. Photobucket Cannot Be Held Liable For Contributory Or Vicarious Infringement

In Counts III and IV of her complaint, Wolk alleges contributory and vicarious copyright infringement by Photobucket.  Because Photobucket is afforded the protection of the DMCA's "safe harbor" provision, these secondary infringement claims are also dismissed.  See Viacom, 718 F. Supp. 2d at 529 ("Defendants are granted summary judgment that they qualify for the protection of 17 U.S.C. § 512(c) . . . against all of plaintiffs' claims for direct and secondary copyright infringement.").  However, in addition to having the protection of this "safe harbor" provision, there are additional reasons why Photobucket cannot, in this case, be held liable for contributory or vicarious copyright infringement.

61

A defendant may be secondarily liable for another's infringement. While "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another," it "does not preclude the imposition of liability for copyright infringements on certain parties who have not themselves engaged in the infringing activity. Sony, 464 U.S. at 434-35. Through contributory infringement, one infringes "by intentionally inducing or encouraging direct infringement." Metro-Goldwyn-Mayer Studios Inc v. Grokster, Ltd., 545 U.S. 913, 930, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005). Vicarious infringement exists where one "profit[s] from direct infringement while declining to exercise a right to stop or limit it." Id. As these definitions suggest, in order to hold a defendant secondarily liable someone else must have directly infringed on the copyright holder's rights. See Faulkner, 409 F.3d 26, 40 (2d Cir. 2005) ("[T]here can be no contributory infringement absent actual infringement."); Matthew Bender & Co. v. West Publ'g Co., 158 F.3d 693, 706 (2d Cir. 1998) (rejecting plaintiff's contributory infringement claim, in part, because the plaintiff "has failed to identify any primary infringer"). Here, however, the Plaintiff has failed to adduce sufficient evidence to support a claim for either contributory or vicarious infringement.

62

i.   **The Evidence Does Not Support The Plaintiff's Allegation Of Contributory Infringement**

Count III of Wolk's complaint alleges that Photobucket engaged in the contributory infringement of Wolk's copyrighted artwork because of its business relationship with the Kodak Defendants.  "To establish a claim for contributory copyright infringement, a plaintiff must allege that the defendant 'with knowledge of the infringing activity, induced, caused, or materially contributed to the infringing conduct of another.'" Brought to Life Music, Inc. v. MCA Records, Inc., No. 02 CIV. 1164, 2003 WL 296561, at *2 (S.D.N.Y. Feb. 11, 2003) (quoting Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971)).  An allegation that a defendant "merely provid[ed] the means to accomplish an infringing activity" is insufficient to establish a claim for contributory infringement.  Livnat v. Lavi, No. 96 CIV. 4967, 1998 WL 43221, at *3 (S.D.N.Y. Feb. 2, 1998); see also Quiroga v. Fall River Music, Inc., No. 93 CIV. 3914, 1998 WL 851574, at *37 (S.D.N.Y. Dec. 7, 1998) ("A mere allegation that the defendant provided the third party with the opportunity to engage in wrongful conduct would not even be enough to survive a motion to

63

dismiss."). Participation must be "substantial." <u>Demetriades</u>
<u>v. Kaufmann</u>, 690 F. Supp. 289, 294 (S.D.N.Y. 1988). In addition
to establishing a defendant's substantial participation, the
plaintiff must also demonstrate the defendant's knowledge of the
infringing activity. One who "supplies another with instruments
by which another commits a tort, must be shown to have knowledge
that the other will or can reasonably be expected to commit a
tort with the supplied instrument. The test is whether [the]
wrongdoing . . . might well have been anticipated by the
defendant." <u>Display Producers, Inc. v. Shulton, Inc.</u>, 525 F.
Supp. 631, 633 (S.D.N.Y. 1981). "[O]ne who furnishes a
copyrighted work to another but is innocent of any knowledge of
the other party's intended illegitimate use will not be liable."
<u>Livnat</u>, 1998 WL 43221, at *3.

       In this case, the Plaintiff has failed to establish
the elements required to state a claim for contributory
infringement. The Plaintiff has not demonstrated Photobucket to
have acted with knowledge that it was passing along infringing
images to the Kodak Defendants. There is also no evidence that
Photobucket and the Kodak Defendants acted in concert to
infringe upon the Plaintiff's rights. Instead, the evidence
suggests that the Photobucket website was, at most, a means for

64

unidentified users of the website to accomplish an infringing
activity.  Although the Plaintiff invokes <u>Metro-Goldwyn-Mayer</u>
<u>Studios</u>, 545 U.S. 913, <u>A&M Records, Inc. v. Napster</u>, 239 F.3d
1004 (9th Cir. 2001) and <u>In re Aimster Copyright Litig.</u>, 334
F.3d 643 (7th Cir. 2003), in support of her claim for
contributory infringement, these cases address facts that do not
exist in the present action.  While those three cases involved
peer-to-peer websites and evidence that facilitating the
unauthorized exchange of copyrighted material was a central
component of the defendants' business strategy, the Plaintiff in
this case has presented no evidence suggesting that Photobucket
sought to encourage copyright infringement or promoted its
service as a means of circumventing copyright.  Additionally, as
described above, the Plaintiff bears the burden of establishing
Photobucket's knowledge of the infringing activity.  The
Plaintiff's attempt to establish knowledge using the notices the
Plaintiff sent is unavailing because, as the Court noted in
<u>Viacom</u>, "knowledge," means "actual or constructive knowledge of
specific and identifiable infringements of individual items,"
not "a general awareness that there are infringements."  <u>Viacom</u>,
718 F. Supp. 2d at 525.  As such, the Plaintiff has presented
insufficient evidence to support a claim for contributory
infringement.

65

ii.  **The Evidence Does Not Support The Plaintiff's Allegation Of Vicarious Infringement**

Count IV of Wolk's complaint alleges Photobucket to have engaged in vicarious copyright infringement. "[O]ne may e vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." Gershwin Publ'g, 443 F.2d at 1162. Similar to contributory liability, vicarious infringement "is established if it is shown that a party, with knowledge of infringing activity, induces, causes, or materially contributes to the infringing conduct of another." Universal City Studios, Inc. v. Nintendo Co. Ltd., 615 F. Supp. 838, 857 (S.D.N.Y. 1985). As described above, the Plaintiff has presented no evidence that Photobucket had any "right and ability to supervise" any alleged infringing activity by the Kodak Defendants, nor is there evidence suggesting that Photobucket had "knowledge" of such infringing activity. Accordingly, Count IV, alleging Photobucket to have vicariously infringed upon Wolk's copyrights, is dismissed.

**Conclusion**

66

Based upon the facts and conclusions set forth above, Wolk's motion for partial summary judgment against the Kodak Defendants, motion for summary judgment against Photobucket, motion to amend, motion to admit expert testimony and motion to investigate are denied, and the Defendants' motions for summary judgment are granted.

It is so ordered.

New York, NY
December 2/, 2011

_____
ROBERT W. SWEET
U.S.D.J.

67